**Tilden David NESMITH**

v.

**TEXACO, INC., et al.**

**Civ. A. No. 79–0197.**

United States District Court,
W. D. Louisiana.

June 18, 1980.

Domengeaux & Wright, Bob F. Wright, Lafayette, La., for plaintiff.

Laborde & Lafargue, C. E. Laborde, III, Marksville, La., for Tidex.

Jones, Walker, Waechter, Poitevent, Carrere & Walker, John R. Peters, Jr. and Anthony M. Fazzio, Lafayette, La., for Texaco, Inc.

Johnson & McAlpine, Michael McAlpine, New Orleans, La., for Pool Offshore.

Lemle, Kelleher, Kohlmeyer & Matthews, Douglas P. Matthews, New Orleans, La., for intervenor.

## OPINION

PUTNAM, Senior District Judge.

Having decided the question of liability in favor of the plaintiff at the conclusion of the evidence, we called for briefs on quantum and whether or not the case was appropriate for prejudgment interest.

Briefly stated, David Nesmith, plaintiff, an employee of Go Wireline Services, a division of Gearhart-Owens Industries, Inc., was injured while being transferred by personnel basket from a vessel owned and operated by Tidex, Inc., to a platform owned by Texaco, Inc., on which Pool Offshore Company had contracted to drill a well in search of oil, gas and other minerals on the outer continental shelf off the Louisiana coast.

Defendant Texaco, found blameless, was dismissed from the suit. Defendants Tidex and Pool were found jointly negligent and cast as joint tort-feasors in the proportions of 40% to Tidex and 60% to Pool.

Plaintiff was 28.77 years of age on March 4, 1978, when the accident occurred. We will treat his age as 29 for purposes of this opinion; at time of trial—two years, one month, and ten days later—he was 31, with a life expectancy of 41.5 years and 31.3 years remaining as a member of the "labor force".

Nesmith fell from a swinging personnel basket that struck one of the stacks of the vessel "JEWELL TIDE", landing on the steel deck of that vessel and injuring his back. He did not consider his injuries serious, but continued to work; however, increasing discomfort prompted him to seek medical advice two months later from Dr. Richard LeBlanc of New Iberia, Louisiana. He was treated conservatively; but, in July, 1978, Dr. LeBlanc determined that he had sustained ruptured discs at the L–4, L–5

level in the lumbar spine. A laminectomy was performed and eventually plaintiff was discharged with a 30% disability that is expected to be permanent. The results of the operation are classified as excellent by all of the physicians who have seen him.

Among other things, plaintiff cannot do any heavy work, which effectively precludes his former occupation with Go Wireline Services as a sales and freepoint operator, or any other heavy work in the "oil patch", and his everyday physical activities are now and will necessarily be curtailed for the rest of his life. He will suffer discomfort in his low back from time to time in the future in varying degrees, depending upon his activity. He is now attending Crawford Rehabilitation Service in Baton Rouge, but at the time of trial no evaluation of his remaining potential had been made. Dr. LeBlanc, his treating physician, stated that the pain he continues to experience in his leg will eventually subside. All doctors recommend against repetitive stooping and/or bending. Other than these things, Dr. LeBlanc opined there was no reason why plaintiff could not lead a normal life.

On the plus side of the ledger, Nesmith is a young and apparently bright person. He obtained a high school equivalency while in the service, and has considered attending college since this accident. He is certainly capable of minimizing future damages by working and earning at the least the prevailing minimum wage. In fact, while the record is barren of proof on this score, the court feels strongly that Mr. Nesmith will lead a highly productive and rewarding life in the future, and that he will not be relegated to sedentary work or to any other position at the minimum wage level. But the court is not now nor have we ever been given to speculation for the purpose of enhancing or diminishing an award of damages for personal injuries. The fact that he will earn at least the prevailing minimum wage was admitted by him and brought out in the evidence at the trial by his expert economist as we shall see hereinafter.

The rule in this Circuit as to damages has only recently been firmly established by the case of *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5 Cir. 1975), cert. den. 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58. That case held that in determining an award for future loss of earnings due to personal injury we should (a) use gross income, before taxes, as a basis for the award, (b) consider only such increases in pay as plaintiff would have earned as merit increases, as opposed to cost of living or inflationary raises, (c) make no allowance or deduction for future income taxes and (d) discount the award over the work life expectancy of the claimant so as to arrive at its present value using the current rate of interest for reasonably safe long-term investments available to the average person at the place of trial. The teachings of *Johnson* are premised upon the proposition that future taxes, inflationary cost of living pay raises, and fluctuating interest rates are too speculative to provide a firm foundation for fixing a reasonable and fair present value for a future loss accruing over a protracted period of time.[1]

On February 19, 1980, however, in *Norfolk & Western Railway Co. v. Liepelt, Administratrix, etc.*, —— U.S. ——, 100 S.Ct. 755, 62 L.Ed.2d 689, the Supreme Court held that it was error for the trial judge to refuse to instruct the jury that "your award will not be subject to any income taxes, and you should not consider such taxes in fixing the amount of your award."[2] In so doing, the court rejected out of hand the proposition that the gross income of the decedent

---

1. *Penrod*, supra, was brought under the Jones Act, 46 U.S.C.A. § 688, which makes the provisions of the Federal Employers Liability Act, 45 U.S.C.A. § 51 et seq., applicable to seamen, for personal injuries sustained by the plaintiff. The wisdom of the rule announced in this case is apparent from present economic trends, fluctuating interest rates and general economic malaise.

2. *Liepelt*, supra, involved an action for death brought by the widow of a railroad employee for her pecuniary losses. The suit was brought under the FELA, 45 U.S.C.A. 51 et seq., which applies to seamen, n. 1, supra.

should be used to determine future pecuniary losses of his widow and dependents at his death. The Court said:

> "It is his after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies." . . .

> "Admittedly there are many variables that may affect the amount of a wage earner's future income tax liability. The law may change, his family may increase or decrease in size, his spouse's earning may affect his tax bracket, and extra income or unforeseen deductions may become available. *But future employment itself, future health, future personal expenditures, future interest rates, and future inflation are also matters of estimate and prediction.* Any one of these issues might provide the basis for protracted expert testimony and debate. *But the practical wisdom of the trial bar and the trial bench has developed effective methods of presenting* the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life. *We therefore reject the notion that the introduction of evidence describing a decedent's after tax earnings is too speculative or complex for a jury."* (Emphasis supplied.)

In view of the specific holding in *Liepelt*, supra, as to the effect of income taxes on the support or pecuniary benefit derived from a person's labor, and the broad language quoted above, it now appears that in arriving at an award for future loss of earnings the very factors disapproved in *Johnson*, supra, should now be considered.

■ In the present case plaintiff presented the testimony of Dr. Herbert Hamilton of Lafayette, Louisiana, an economist of considerable eminence in this area. It was his view that a fair discount rate at the time of trial was 8%, and that the growth rate of wages for oil field production workers such as Mr. Nesmith during the period from 1960 to 1978 was 6.21%. He also took into account pay raises which have been extended to wireline operators in plaintiff's old position from the time of his injury in March of 1978 until October, 1979, which indicated an increase of 21.85% over this comparatively short period of time, to calculate plaintiff's losses to date of trial. Considering the uncontradicted testimony of Dr. Hamilton, we conclude that the growth rate for wages based upon inflationary factors for the next thirty years in the oil fields of Louisiana, will be approximately 6%.

This expert also projected plaintiff's income tax rate over the period in question to be approximately 15%. The total monetary losses calculated by Dr. Hamilton amount to $822,325.57, less the present value of earnings over this period calculated at the prevailing minimum wage, $150,296.44,[3] or $672,029.43.

We find, however, that Dr. Hamilton added an additional 30% of plaintiff's gross earnings for fringe benefits extended to Go Wireline employees, and that he also included an additional 17.16% of plaintiff's gross wages as the amount he would have earned as "bonus" pay under his employment contract. We do not find the evidence in this case sufficient to establish these two items by the required preponderance. The fringe benefits were taken by Dr. Hamilton from a brochure for prospective Go Wireline employees, chief among which is a profit sharing plan in which plaintiff did not participate, and no supporting evidence was offered to show the value of the remaining benefits, such as health insurance, the use of a company vehicle and credit card, etc., all matters easily proved.

The "bonus" pay added to plaintiff's wages is a varying percentage of the amount charged by his employer for those

---

**3.** In arriving at this figure the increase in minimum wage was used, and an average annual increase since 1938 of 6.22% was employed. The discount rate of 8% was also used.

jobs undertaken by Nesmith. The 17.16% figure used by Dr. Hamilton was reached by deducting the total amount of his base pay from the gross income reported by him as earned during the year 1977. However, for the first three months of 1978, at a base salary of $1,575.00 per month, which was the same as his pay in 1978, he reported a gross income of $6157.51, and, if the difference of $1432.51 is to be considered as bonus pay, the percentage would be approximately 23%.

Accordingly, we use his average monthly earnings at the time of his accident, one-third of $6,157.51, or $2052.50 per month ($24,630.00 per year) as the base upon which to predicate his losses. Our calculations are as follows:

1. Earnings lost to time of trial 2.1 years at $24,630.00 per annum   $ 51,723.00

2. Future loss of earnings, discounted at 8% per annum and subject to a growth factor of 6% per annum, or a net discount rate of 2% over 31 years   $564,962.94

| | |
|---|---|
| Total lost wages | $616,685.94 |
| Minus 15% income tax | $ 92,502.89 |
| | $524,183.05 |
| Less wages at minimum wage over the same period at the same discount rate | $151,302.72 |
| TOTAL | $372,880.33 |

In addition to this sum, plaintiff is due an award for pain, suffering and mental anguish suffered by him in the past and that he will probably suffer in the future, plus past and future medical expenses.

By stipulation, the medical expenses were paid by intervenor, Employers National Insurance Company. These expenses amounted to $8,390.77 to date of trial. Compensation has also been paid plaintiff at a daily rate of $41.91. Up to the date of trial these payments totaled $38,150.70, and were con-

tinuing. Intervenor's lien on the recovery effected herein is recognized, and while we will add medical expenses to plaintiff's award there should be no mistake as to their payment.

Pain and suffering, mental anguish and discomfort, past and future, are difficult to value. Considering plaintiff's youth and his long life expectancy, and the restrictions his injury will impose upon his future activities in the recreational field, we believe an award of $100,000.00 will adequately and fairly compensate him for these items of damages as well as any and all future medical expenses he may incur as a result of these injuries.

The final award, including Intervenor's claim for medical expenses, is accordingly calculated as follows:

| | |
|---|---|
| Wages (from above) | $372,880.33 |
| Past medical expenses | 8,390.77 |
| Past and future pain, etc. and medical expenses | 100,000.00 |
| | $481,271.10 [4] |

We next direct our attention to the question of prejudgment interest. In this case defendant Pool was operating on the fixed platform and its negligence, through its crane operator, occurred on this man-made island to which the laws of Louisiana apply. Title 43 U.S.C.A. § 1333. *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). On the other hand, the co-tort-feasor, Tidex, was operating the vessel JEWELL TIDE, and its liability for this accident is purely maritime in nature. Two cases, *Berry v. Sladco, Inc.*, 495 F.2d 523 (5 Cir. 1974) and *Aymond v. Texaco, Inc.*, 554 F.2d 206 (5 Cir. 1977) have unequivocally held that the provisions of Title 28 U.S.C.A. § 1961 govern the allowance of interest in these cases,

4. Calculated under the rule of *Johnson v. Penrod Drilling Co.*, supra, loss of future wages using the same base earning of $24,600.00 per year discounted at 8% per annum would be $279,210.00, which, with the other elements of loss and a deduction for present value of possible future earnings in a minimum wage job, would result in a total verdict of $369,436.44, a difference of $111,834.66 in amount in favor of plaintiff under our construction of *Norfolk & Western Railway Co. v. Liepelt, Administratrix*, supra. We are mindful of the fact that this interpretation of *Liepelt* may be erroneous, and *Johnson* may still bar the door to speculative damages as to factors other than income taxes in a case of future loss from personal injuries.

there is no void in federal law, and that statute requires interest to run from date of entry of judgment, rather than from judicial demand as is the case under Louisiana law.

On the other hand, § 1961 has been interpreted as not prohibiting prejudgment interest in maritime cases, where its payment is left to the discretion of the trial judge; see: *Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d 958 (5 Cir. 1969); *Canova v. Travelers Ins. Co.*, 406 F.2d 410 (5 Cir. 1969); *Doucet v. Wheless Drilling Co.*, 467 F.2d 336 (5 Cir. 1972) and *Howell v. Marmpegaso Compania Naviera*, 578 F.2d 86 (5 Cir. 1978) as examples of cases falling into this category.

Again, in cases arising under the Death on the High Seas Act, Title 46 U.S.C.A. § 761, et seq., it has been held that the widow's claim for pecuniary losses should bear interest from date of death in order to provide her fair and just compensation, *National Airlines, Inc. v. Stiles*, 268 F.2d 400 (5 Cir. 1959), but not for an unliquidated claim under the Jones Act, 46 U.S.C.A. § 688, for personal injuries, where the losses extend into the future, *Barrios v. Louisiana Construction Materials Co.*, 465 F.2d 1157 (5 Cir. 1972). Where the loss is a property loss, or when interest is to be allowed to "make the injured party whole" presents yet another category of cases. See, *West v. Harris*, 573 F.2d 873 (5 Cir. 1978), at 882, 883 and 884 for a full discussion of the problem.[5]

On balance, we feel that this case is not one where prejudgment interest should be allowed, and accordingly disallow this claim.

This leaves only the question of whether or not the cross-claim of Texaco against Tidex has any merit. The cross-claim of Tidex against that defendant was denied at the conclusion of the trial, and judgment was reserved on the claim of Tex-

aco. A reading of the contract between Texaco and Tidex fails to disclose any express provision which would require Tidex to indemnify Texaco. Texaco was absolved from liability, and its defense was assumed by Pool Offshore during the trial under an express indemnity provision in the agreement between these two parties.

The claim of Texaco against Tidex is, therefore, denied.

Judgment is rendered accordingly. The parties shall forthwith prepare a formal judgment in keeping herewith and forward it to the Court for signature. The Clerk is directed that no entry of judgment be made herein until such time as the formal decree is signed and filed.

---

5. There appears to be a conflict in the interpretation placed upon 28 U.S.C.A. § 1961 by the court in *Berry v. Sladco*, supra, and *Aymond v. Texaco, Inc.*, supra (en banc), and *Illinois Central R.R. Co. v. Texas Eastern Transmission Corp.*, 5 Cir., 551 F.2d 943, and *West v. Harris*, supra. The matter properly addresses itself to the Congress. There is a need for *one* rule to be applied uniformly in all cases not covered by special statutory provisions, and § 1961 as it has been interpreted does not accomplish this.